# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA

## Florence Division

| | |
|---|---|
| Douglas Lhamon, | Case No.: |
| *Plaintiff,* | |
| v. | JURY TRIAL DEMANDED |
| NEVRO CORPORATION | |
| and | |
| GLOBUS MEDICAL, INC. | |
| *Defendants.* | |

## COMPLAINT

## INTRODUCTORY STATEMENT

1. This is a device tort action brought on behalf of the above-named Plaintiff arising out of the tortious conduct of the Defendant named herein related to the implantation and subsequent injurious failure of the Nevro HFX spinal cord stimulation device ("SCS" or "product"). As a result of the wrongful conduct enumerated herein, Plaintiff Douglas Lhamon ("Plaintiff") suffered permanent injuries and significant pain and suffering, emotional distress, lost wages and earning capacity, and diminished quality of life. The Plaintiff respectfully seeks all damages to which he may be legally entitled.

2. Plaintiff files this Civil Action Complaint, alleging violations of state and federal requirements in the manufacture, labeling, warning, reporting and marketing, as well as breach of warranties, and other legal duties and requirements with regards to Nevro's HFX Senza Spinal Cord Stimulation System ("HFX" or "Senza").

1

3. As a direct and proximate result of Nevro's violations of FDA laws, regulations and requirements, and their respective parallel state law requirements, Nevro's HFX implants caused Plaintiff to suffer injuries and losses as enumerated herein.

4. Defendant Nevro Corporation (hereinafter, "Defendant" or "Nevro") cannot avoid civil liability for these defective HFX implants by asserting a preemption defense because (1) the Senza system is not properly approved by the FDA in that the PreMarket Approval (PMA) supplement through which Defendant introduced the Senza into interstate commerce failed to disclose the substantial specification changes from the previously approved device; (2) Defendant failed to comply with: critical quality system regulation (QSR) and current good manufacturing practice (CGMP) requirements required by the Food & Drug Administration ("FDA"), the FDA's Premarket Approval Application requirements, and FDA requirements to warn consumers of the known dangers and known adverse events as required by conditions of approval and post-marketing regulations;[1] and (3) Defendant engaged in tortious conduct not governed by federal regulation that directly led to Plaintiff's injuries.

5. Nevro's permanent HFX system consists of a rechargeable implantable pulse generator device ("IPG") with 16 output channels which is connected to lead wires with electrodes which are implanted in contact with a patient's spinal cord. Each of the 16 outputs can be programmed as a cathode or an anode. The IPG is powered by a 3.6 V nominal Li-Ion

---

[1]The failure to follow the CGMPs and QSRs precludes a preemption defense and provides a basis for liability as violations of federal law that are parallel state law claims. See *In Re Smith & Nephew Birmingham Hp Resurfacing (BHR) Hip Implant Prods. Liab. Litig.* 300 F. Supp. 3d 732, 746 (D. Md. 2018). In addition, because Plaintiff alleges the implants were "adulterated" by virtue of failure to conform to applicable performance standards, federal law specifically incorporates CGMPs. 21 U.S.C. § 351.

rechargeable battery (single cell). It can stimulate the spinal cord nerves through the electrodes of the leads connected to any combination of the output terminals, using a single current source.

6. The performance parameters of the HFX include percutaneous lead performance, wave form, pulse shape, amplitude, output voltage, pulse width, and frequency. One of the performance requirements imposed by the FDA when it approved the sale of the device in May 2015 was that the impedance in ohms of the percutaneous leads must be less than 18.

7. 21 CFR § 898.12 provides that any connector in a cable or electrode lead wire having a conductive connection to a patient shall be constructed in such a manner as to comply with subclause 56.3(c) of the International Electrotechnical Commission (IEC) 601-1: Medical Electrical Equipment.

8. On information and belief, Defendant's own internal records suggest that the HFX unit manufactured by Defendant and implanted in Plaintiff failed to conform to the aforesaid standards because the impedance in ohms exceeded 18 on the dates that Plaintiff's injuries occurred.

9. At all relevant times, the HFX was widely advertised and promoted by Defendant as a safe, effective, and permanent treatment for management of chronic back pain in a way that stepped beyond the safety and efficacy statements approved by the FDA.

10. Also pursuant to FDA regulations, manufacturers of SCS components are required to report "serious adverse events" to the FDA. 21 CFR § 803.50. The phrase "serious adverse event" is an FDA term of art, but for purposes of this case, a serious adverse event includes an event – including a medical device malfunction -- that may jeopardize

3

the patient and may require medical or surgical intervention to prevent one of the other accepted "serious" outcomes. See for example: https://www.fda.gov/safety/reporting-serious-problems-fda/what-serious-adverse-event.

11. The time frame for submitting an adverse event is within either 5 or 30 days of the manufacturer becoming aware of the event and is not based on the time that the event occurred; the shorter five-day time limit is based on if the event necessitates remedial action. 21 CFR § 803.53(a).

12. With respect to medical device safety, malfunction events are potentially attributed to complex failure modes and root causes are not always well understood, either by the FDA, the manufacturer, or by both.

13. Among other things, 21 CFR § 803 requires the submission of an individual malfunction medical device report (MDR) when a manufacturer becomes aware of information, from any source, which reasonably suggests that one of its marketed devices malfunctioned and the malfunction of the device or a similar device marketed by the manufacturer would be likely to cause or contribute to a death or serious injury if the malfunction were to recur (§§ 803.10(c)(1) and 803.50(a)(2)). The FDA refers to these malfunctions as "reportable malfunctions" or "reportable malfunction events."

14. Under section 519(a)(1)(B)(i) of the FD&C Act, Title 21 Chapter 9 of the United States Code, as amended by Food and Drug Administration Amendments Act (FDAAA) of 2007, manufacturers of permanently implantable devices such as the subject SCS must submit malfunction reports in accordance with part 803 (or successor regulations), unless the FDA grants an exemption or variance from, or an alternative to, a requirement under

such regulations under § 803.19. Defendant Nevro has not been granted any such exemption.

15. The FDA uses MDRs to monitor device performance, detect potential device related safety issues, and contribute to benefit-risk assessments of these products. The Manufacturer and User Facility Device Experience (MAUDE) database houses the MDRs, and is available to the public, to device manufacturers, and most importantly, treating physicians.

16. The FDA uses MDRs to monitor device performance, detect potential device related safety issues, and contribute to benefit-risk assessments of these products. The MAUDE database reveals that prior to June 10, 2020, there were reports of IPG malfunctions including "burning," "overheating of device," and "heating at the pocket site."

17. In November 2018, the Associated Press released findings from a yearlong joint investigation of the global medical devices industry that included NBC, the International Consortium of Investigative Journalists and more than 50 other media partners around the world.[2]

18. The AP's analysis of FDA injury reports found that "shocking" and "burning" had been reported for all major models of spinal-cord stimulators.

19. The subject implanted spinal cord stimulator was manufactured by Nevro Corp. with serial number 881808.

20. The HFX is a "Class III" medical device cleared for commercial distribution by the U.S. Food and Drug Administration ("FDA") through the premarket approval (PMA) process.

---

[2]https://apnews.com/article/wv-state-wire-us-news-ap-top-news-sc-state-wire-health-86ba45b0a4ad443fad1214622d13e6cb

21. As part of the approval process referred to above, Defendant was required to engage in limited clinical trials.

22. A device may not be manufactured, packaged, stored, labeled, distributed, or advertised in a manner that is inconsistent with any conditions to approval specified in the PMA approval order for the device. 21 C.F.R. §814.80.

23. The HFX was approved by the FDA in May 2015.

24. A medical device manufacturer's responsibilities do not end with FDA approval. The concept of "post-market surveillance" (PMS) has been discussed in the medical device industry since before 2005.

25. In the United States, the term PMS is used explicitly to grant the FDA the authority to require manufacturers to perform studies of medical risk devices, such as the device at issue, which have previously been granted PMA approval.

26. 21 CFR Part 822 details the requirements for PMS in the United States. Broadly stated, The FDA has authorization to require post-market surveillance for class III medical devices that are intended to be implanted in the human body for over one year.

27. The subject SCS is intended to be implanted in the human body for over one year.

28. The FDA requires Nevro to "track" its SCS devices, including the subject device, because they are intended to be implanted for over a year.

29. According to the FDA:

> i. *Post market surveillance is the active, systematic, scientifically valid collection, analysis, and interpretation of data or other information about a marketed device. The data collected under a surveillance order helps to address*

*important public health questions on the safety and*
*effectiveness of a device.*[3]

30. According to the World Health Organization, "it remains important to continue to collect and evaluate information on the medical device during production and postproduction to meet requirements for the monitoring of products and processes and to ensure the residual risks remain acceptable with respect to benefits. Appropriate processes allow for early detection of any undesirable effects."[4]

31. Independent of PMSs, medical device manufacturers must follow certain requirements and regulations once devices are on the market. These include reporting of device malfunctions. To the extent that manufacturers comply with their FDA surveillance responsibilities, the reports often appear, directly or indirectly, in the MAUDE database.[5]

32. In addition to the aforementioned abuse of the FDA's PMA process and violations of FDA regulations, Defendant also engaged in reckless violations of state law through conduct outside the scope of the FDA's regulatory powers by allowing unlicensed individuals to practice medicine, or on South Carolina citizens. "Practice of Medicine" is defined under S.C. Code Ann. § 40-47-20 (36)(g) (2024) to include, "offering or undertaking to prevent or to diagnose, correct or treat in any manner, or by any means, methods, or devices, disease, illness, pain, wound, fracture, infirmity, defect, or abnormal

---

[3] https://www.fda.gov/regulatory-information/search-fda-guidance-documents/postmarket-surveillance-under-section- 522- federal-food-drug-and- cosmetic-act
[4] https://www.who.int/publications/i/item/9789240015319
[5] Underreporting of adverse events is a common problem. "[I]t is evident that [adverse event] reporting does not occur to a great extent, with the rate of reporting estimated to be as low as 0.5% of all occurrences….need for improved vigilance and post-market surveillance has been highlighted in the recent changes to the European Union Medical Device Regulation" Need for Greater Reporting of Medical Device Incidents (EMJ, Jan, 2019)

physical or mental condition of a person, including the management of pregnancy and parturition."

33. Under S.C. Code Ann. § 40-47-200 (2024) the penalties for any person who practices or offers to practice medicine mandates imprisonment not to exceed one year, or a fine not to exceed $50,000 per violation.

34. At all times relevant, Defendant employed non-licensed sales representatives to adjust the programs on the Senza devices implanted into patients for the treatment and management of back pain. Those individuals then directly changed the physical positioning of leads implanted in patients and/or directed those patients to adjust the settings of their devices to treat and manage their back pain.

35. At all times relevant, Nevro and its agents knew or should have known that the Senza device implanted in Plaintiff posed a significant risk of producing an impedance in ohms greater than 18 and that such an occurrence posed a significant risk of damage to the nerve, neurologic, and spinal health of end users like Plaintiff when left in the hands of unlicensed individuals like their sales representatives.

36. Likewise, Nevro knew or should have known that allowing its own unlicensed sales representatives to control the Senza device implanted in patients, regardless of its impedance limitation, poses a significant risk of human error in the adjustment of settings on the Senza devices because the device, by its very nature and intended purpose, delivers electrical stimulation to the patient's nervous system. By allowing unlicensed sales representatives to control such a device, Defendant introduced a significant risk that end users like Plaintiff will be shocked and, as is the case here, incur significant nerve, neurologic, and/or spinal cord injuries and/or dysfunctions.

37. Plaintiff brings this action against Nevro in relation to the manufacture, marketing, reporting, and distribution of Nevro's HFX implants, the repeated failure to follow the requirements imposed by FDA, failure to warn Plaintiff's healthcare providers of known dangers and known adverse events, and reckless violation of state law.

### PARTIES, VENUE AND JURISDICTION

38. Plaintiff Douglas Lhamon ("Plaintiff") is, and was, at all relevant times, a citizen and resident of Conway, South Carolina, located in Horry County.

39. Defendant, Nevro Corporation (hereinafter "Nevro"), is a Delaware Corporation which has its principal place of business in the State of Pennsylvania.

40. Defendant Globus Medical, Inc. (hereinafter "Globus") is a Delaware corporation which has its principal place of business in the State of Pennsylvania. On February 6, 2025, Globus and Nevro entered into an agreement whereby Globus acquired Nevro, making Nevro a wholly owned subsidiary of Globus. The terms of the merger agreement include the assumption by Globus of, *inter alia*, Nevro's liabilities for warranty claims.

41. Nevro has conducted business and derived substantial revenue from within South Carolina and has sufficient minimum contacts and purposefully availed themselves of the South Carolina market so as to render the exercise of jurisdiction over it by the South Carolina courts consistent with the traditional notions of fair play and substantial justice. The instant cause of action arises from and is related to Nevro's contacts with, and conduct and transactions within, the State of South Carolina.

42. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. §1965 (a) because a substantial part of the events or omissions giving rise to the claim occurred in

this District and each Defendant transacts business affairs and conducts activity that gave rise to the claim of relief in this District.

43. This Court has personal jurisdiction over Defendant as Defendant conducted such business within the State including acts which caused or contributed to Plaintiff's injuries. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because there is complete diversity of citizenship between the parties. In addition, Plaintiff seeks damages in excess of $75,000, exclusive of interest and costs.

44. At all relevant times, Nevro negligently and recklessly conveyed false and misleading information concerning the HFX implants and concealed the risks of serious adverse events associated with the HFX implants from Plaintiff, Plaintiff's healthcare providers, the FDA and the public. But for Nevro's actions, Plaintiff would not have suffered the severe injuries and harms that have resulted from the implantation of the HFX implant into Plaintiff 's body.

## FACTS REGARDING NEVRO'S HFX DEVICES

### A. Nevro's SCS Products

45. Defendant Nevro designs, manufactures, markets, and distributes the Nevro HFX Senza SCS, an implantable device indicated for the treatment of limited varieties of chronic and intractable pain.

46. Defendant's SCS product includes an Implanted Pulse Generator (IPG) and percutaneous lead wires. The IPG is a rechargeable implantable device with 16 output channels. Each of the 16 outputs can be programmed as a cathode or an anode. The IPG is powered by a 3.6 V nominal Li-Ion rechargeable battery (single cell). It is capable of stimulating the

spinal cord nerves through the electrodes of the leads connected to any combination of the output terminals, using a single current source.

47. The IPG component of the SCS is implanted in the patient subcutaneously, and the lead wires are implanted and secured along predetermined locations along the patient's spinal cord.

48. Once implanted and operational, the SCS delivers electrical impulses to the patient's spinal cord, with the purpose of modulating the electrical pain signals which manifest in subjective patient pain.

49. The implantation parameters for the SCS and the magnitude of electrical stimulation delivered by it often results in repeated electrical insult to one or more branches of the vagus nerve and other nerve tissues.

50. The different branches of the vagus nerve, respectively, modulate such processes as esophageal motility, cardiac rhythm, equilibrium, bowel function, and many others.

51. The overstimulation caused by the design of the Nevro SCS can lead to dysmotility, syncope, arrhythmias and incontinence.

52. Moreover, the magnitude and duration of insult to the vagus nerve caused by the Nevro SCS can give way to a process called nociception, whereby the parasympathetic nervous system perpetuates the manifestations of the aforementioned overstimulation, rendering the complications functionally permanent.

53. Defendant is aware of these risks and has failed to adequately warn patients or medical providers, including those of Plaintiff.

54. Other manufacturers of SCS devices include warnings on their devices of these potential adverse events.

55. In the 1976 Medical Device Amendments (MDA) to the Federal Food, Drug, and Cosmetic Act (FDCA), Congress instituted a process for product review and clearance, using different pathways and processes to permit drugs and medical devices to be sold to U.S. consumers. Three classes of medical devices are regulated by the FDCA, Class I, Class II and Class III, with greater degrees of scrutiny and regulation imposed on the manufacturer as the levels go from I to III.

56. Class III devices are those that support or sustain human life, are of substantial importance in preventing impairment of human health, or which present a potential, unreasonable risk of illness or injury.

57. Premarket approval (PMA) is the FDA process of scientific and regulatory review to evaluate the safety and effectiveness of Class III medical devices.

58. Under a Class III PMA, manufacturers have substantial and ongoing duties because of the degree of risk associated with products carrying the classification. Failing to fulfill the duties or comply with the associated requirements can result in the PMA being withdrawn.

59. State law, via common law and statutory enactments, provides financial remedies for personal injuries arising from violations of parallel federal regulations applicable to Class III devices. 21 U.S.C. § 360(k)(a).

60. Nevro received Pre-Market Approval from the FDA for the Senza spinal cord stimulator in May 2015.

### A. Nevro's Sales and Marketing Practices

61. At all relevant times, Nevro engaged in aggressive and deceptive sales practices in order to market the HFX device to clinicians engaged in the practice of spinal surgery and treatment of chronic pain syndromes.

62. These sales practices involved direct contact between Nevro sales representatives and patients, including Plaintiff.

63. As a prerequisite to reimbursement for the cost of SCS devices, including the Nevro HFX devices, public and private insurance providers maintain strict requirements to assure that the placement is medically necessary, including:

    A. The implantation of the stimulator is used only as a late resort or (if not last resort) for patients with chronic intractable pain.

    B. With respect to the first condition, other treatment modalities (pharmacological, surgical, physical, or psychological therapies) have been tried and did not prove satisfactory or are judged to be unsuitable or contraindicated for the given patient.

    C. Patients have undergone careful screening, evaluation, and diagnoses by a multidisciplinary team prior to implantation (such screening must include psychological, as well as physical evaluation).

    D. All the facilities, equipment, and professional and support personnel required for the proper diagnosis, treatment training, and follow-up of the patient (including that required to satisfy the third condition) must be available.

    E. Demonstration of pain relief with a temporarily implanted electrode precedes permanent implantation. Such relief must exhibit either 50% or greater reduction

of the patient's pain or 50% or greater reduction of the patient's reliance on

analgesic pain medications.[6]

64. In order to assure the placement of a permanent stimulator implant following the trial

stimulation and procure reimbursement for an SCS device, Nevro's sales representatives

are trained to make false and/or misleading statements to patients and/or healthcare

providers during the trial stimulation period.

65. The aforesaid false and misleading statements are intended to induce patients and

healthcare providers to move forward with implantation of the permanent SCS device.

**B. Facts Specific to Plaintiff**

66. Around Spring of 2022, Plaintiff was introduced to Nevro sales representatives as part of

an evaluation for SCS therapy. The full names of these representatives are unknown, but

Plaintiff believes, and on that basis alleges, that their first names are Chelsea, Charity,

and Beth.

67. Neither Chelsea, Charity, nor Beth had any medical training or medical certification in

pain management, neurology, or neuromodulation.

68. Following a surgical procedure in April of 2022 in which trial stimulator leads were

implanted in Plaintiff and connected to an external pulse generator, a Nevro sales

representative, whose name is unknown, consulted with Plaintiff and participated in

manipulating the electrical pulse settings of the trial device. At the conclusion of the trial

period, Plaintiff reported significant reduction in his lower back pain.

---

[6]See, e.g. CMS NCD Manual, chapter 1, part 2, § 160.7(B)(2), Electrical Nerve Stimulators.

69. As part of ongoing direct marketing efforts, Chelsea, Charity, and Beth, as agents of Nevro and within the scope of their employment by Nevro, made the following material representations to Plaintiff, knowing them to be false:

   A.  That the pain relief delivered by a permanent IPG implant would be equal to or better than those achieved in the Trial Stimulation period.

   B.  That the permanent HFX would permanently deliver substantial pain relief.

   C.  That they and Nevro's other representatives would be readily available to Plaintiff for the purpose of adjusting device settings to optimize pain relief.

   D.  That Plaintiff would be able to resume normal activities of daily living following implantation of the permanent HFX IPG.

   E.  That the permanent HFX was safe to use and would not cause damage or otherwise affect Plaintiff's spine, nerves, or nervous system function.

   F.  Nevro's sales reps have the medical knowledge and training necessary to make purposeful, effective adjustments to the HFX device settings to achieve adequate pain relief.

   G.  Nevro had not received any complaints regarding the Senza device.

70. Chelsea, Charity, and Beth as agents of Nevro and within the scope of their employment by Nevro, committed knowing omissions and suppressions of material facts, such that Plaintiff would not have permitted the HFX to be implanted had he known of such facts:

   A.  That the trial Nevro SCS device was manufactured by a company other than Nevro and it differed materially in specifications and function from the permanent device.

15

B. That numerous patients have complained to Nevro that the permanent HFX implant failed to deliver the pain relief results of the trial stimulator.

C. That a large percentage of Nevro's permanent SCS devices are eventually explanted due to device failure.

D. Nevro's sales reps lack the necessary training or knowledge to make purposeful adjustments to the device settings in order to achieve adequate pain relief.

E. That the pain relief delivered by the permanent Nevro SCS is known to be short-lived in a large number of patients and that a substantial proportion of patients that are implanted with a Nevro HFX device elect to have it surgically removed within two years of implant.

F. That the permanent HFX device was capable, either by malfunction or misuse by Nevro agents, of shocking users like Plaintiff to an extent that could render them permanently impaired, weak, disabled, in pain, or suffering from nerve system dysfunction.

G. That a large proportion of patients implanted with a Nevro HFX device have reported severe complications not enumerated in the Instructions for Use (IFU) that accompanies the product. These commonly reported complications include:

    i. Chronic or permanent visual and/or cognitive disturbances;

    ii. Chronic or permanent dysphagia;

    iii. Cardiac arrhythmias;

    iv. Chronic or permanent bowel and/or bladder incontinence; and

    v. Chronic or permanent ataxia and/or lower extremity weakness.

H.  That the HFX loses battery power rapidly, requiring frequent, long periods to recharge the device.

I.  That certain lead wire extenders commonly attached to the device render the device incompatible with Magnetic Resonance Imaging.

J.  That the permanent SCS to be implanted in Plaintiff was not capable of delivering the same pain-relieving effect as that of the trial SCS due to mechanical limitations of the permanent SCS compared to the trial SCS.

71. These representations and omissions differ drastically from the literature approved by the FDA to accompany the device in that they represent both superior pain relief outcomes than those addressed by the literature and/or affirmatively deny the possibility of adverse events greater in severity than those addressed by the literature. Additionally, these representations refer or relate to the safety and efficacy of Nevro's employment of sales representatives to engage in the unlicensed practice of medicine, a topic that the FDA approved literature does not speak to.

72. On or about August 15, 2022, Plaintiff underwent placement of a permanent Nevro Senza SCS by Dr. Gabe Hillegass.

73. On or about December 13, 2022, Plaintiff went to the emergency room for shocks and back pain. Dr. Kline and other surgeons were unable to find the cause of the pain and even noted that the leads were still in the correct position.

74. On or about February 6, 2023, Plaintiff had to start using a wheelchair as his primary form of movement. Since then, Plaintiff has become wheelchair bound 70-75% of the time, and is unable to walk, unassisted, for medium or long distances.

75. On or about March 2, 2023, Douglas Lhamon went to Grand Strand Regional Medical Center for neck pain that radiates to his arms and paresthesia in both hands. Dr. Kleist believed his symptoms were age-related joint deterioration.

76. Around this time Douglas began calling, texting, and discussing with Chelsea, Charity, and Beth that he was having issues with his spinal stimulator. Mr. Lhamon then contacted at least one Nevro rep several times a week until January of 2024 complaining about various issues ranging from shocking and burning to the inability to live his life without a wheelchair.

77. On or about April 18, 2023, Mr. Lhamon again was seen for neck and arm pain. Now, Mr. Lhamon's arms have begun to cramp, and he begins holding them in a guarded position for some relief from the pain. Grand Strand specifically noted that the Nevro spinal stimulator was not helping relieve pain.

78. On or about September of 2023, Douglas began to feel numbness in his legs even while he was in his wheelchair. His leg weakness had now progressed to the point where he could not carry a gallon of milk to his fridge without feeling like he was going to fall.

79. On or about October 5, 2023, Mr. Lhamon was seen for elbow tenderness and pain, and he discussed with his doctor that he is unable to pick up his grandchild because of the pain.

80. On or about September 21, 2024, Mr. Lhamon was seen specifically for shortness of breath but also noted that the past couple days he had begun feeling dizzy and falling. So far, none of the falls has caused any injuries.

81. On or about September 14, 2025, Mr. Lhamon went to the ER because of a fall. While at home, he lost his balance and tried to catch himself on the counter. Instead, he struck his

back on the counter and fell to the ground. Since the fall, Mr. Lhamon had been experiencing increased back pain, so he went to the hospital.

82. At one reprogramming, the date of which is unknown, Beth told Mr. Lhamon that Nevro had received multiple complaints about the implants causing shocking and burning. This was completely opposite to what Charity and Chelsea told him before he decided to follow through with the implant. Initially, he was told there had been no complaints.

83. At the time the HFX placed was into Plaintiff's body, he was not advised, nor did he have any independent knowledge, that it was associated with or could cause the injuries enumerated herein.

84. Plaintiff's healthcare providers did not warn Plaintiff of the aforementioned risks with use of the HFX because they were not warned of the risks.

85. Had Nevro informed Plaintiff's healthcare providers of the true risks associated with the HFX implants, Plaintiff's providers would have advised against implantation of the Nevro HFX.

86. Nevro, through its misrepresentations and omissions including their refusals or reckless failures to disclose or report defects and significant events as required by federal law (21 C.F.R. §§ 803.10(c), 803.50, 803.52 and other C.F.R. sections identified herein), and by state law which does not impose duties or requirements materially different from those imposed by federal law, concealed from Plaintiff and his healthcare providers the aforementioned risks associated with the HFX implants. All conditions precedent to filing this action have occurred or have been satisfied or waived.

### NEVRO'S DUTIES PURSUANT TO ITS PMA AND FEDERAL REGULATIONS

87. As conditions of Nevro's PMA approval for its HFX device, the FDA required Nevro to conduct the following post-approval studies to characterize the long-term performance and safety of the devices:

    A. **"Core Post-Approval Study"** - To assess long-term clinical performance of the device.

    B. "**Large Post-Approval Study"** - To assess safety and efficacy in larger patient populations and/or longer periods of time.

    C. **"Device Failure Studies"** - to continue preclinical studies to characterize the modes and causes of failure of explanted devices.

    D. **"Focus Group Study"** - To improve the format and content of the patient labeling.

    E. **"Informed Decision Process"** – Nevro was required to distribute the approved patient labeling and administer a survey to determine the success of this process and provide a summary of the findings to the FDA.

88. In the PMA approval letter, the FDA further stated, "[f]ailure to comply with any post-approval requirement constitutes a ground for withdrawal of approval of a PMA. Commercial distribution of a device that is not in compliance with these conditions is a violation of the act."

89. In addition to the duties in Nevro's PMAs, Nevro was required to strictly adhere to the design, manufacturing, packaging, storage, labeling, distribution, and advertising specifications set forth in applicable federal regulations, including, but not limited to, 21 C.F.R. Parts 803, 814 and 820.

90. Nevro was also required to notify the FDA of any unexpected serious problems with its HFX devices.

91. Nevro is required by federal law (and parallel state law) to sell and distribute only non-adulterated products pursuant to its PMA. A medical device is deemed adulterated if, among other things, it fails to meet established performance standards, or if the methods, facilities or controls used for its manufacture, packing, storage or installation are not in conformity with federal requirements. This duty is ongoing. *See* 21 U.S.C. § 351.

92. Nevro is prohibited from selling and distributing misbranded products. A medical device is deemed misbranded if, among other things, its labeling is false or misleading in any particular, or if it is dangerous to health when used in the manner prescribed, recommended or suggested in the labeling. This duty is ongoing. *See* 21 U.S.C. § 352(a). Moreover, restricted devices are deemed misbranded if "its advertising is false or misleading in any particular." 21 U.S.C. § 352(q).

93. Nevro was also required to do the following:

  A. Report to the FDA information suggesting that one or more of the manufacturer's devices may have caused or contributed to a death or serious injury, or has malfunctioned and would be likely to cause death or serious injury if the malfunction were to recur [21 C.F.R. § 803.50];

  B. Monitor the product and report to the FDA any complaints about its performance and any adverse health consequences that are or may be attributable to the product [21 C.F.R. § 814]; and

  C. Follow quality system requirements, found in 21 C.F.R. § 820, the CGMPs, that require manufacturers document all Corrective Action and Preventative Actions

taken by the manufacturer to address nonconformance and other internal quality control issues [21 C.F.R. § 820.100].

94. The primary responsibility for timely and accurately communicating complete, accurate and current safety and efficacy information related to medical devices, such as the HFX implants, rests with the manufacturer.

95. This primary reporting obligation instills in Nevro a duty to vigilantly monitor all reasonably available information, to closely track clinical experiences, and to fully and promptly report all relevant information, specifically but not limited to adverse events, to the FDA, the healthcare community, and consumers.

96. Similarly, under state law, which does not impose duties or requirements materially different from those imposed by federal law, the manufacturer must precisely monitor its own manufacturing and quality control processes, and its market representations and warranties.

97. These duties establish that time is of the essence for Nevro when reporting adverse events, especially, but not limited to, those adverse events indicating an association between its product and serious injuries.

98. Delayed reporting prevents the healthcare community and the public from timely learning of risks which informs physician and patient decision-making regarding treatments and procedures and thereby exposes countless additional patients to potential harm.

## NEVRO'S PARALLEL SOUTH CAROLINA STATE LAW DUTIES

### A. Nevro's Warning Duties

99. In the interest of promoting health and safety, South Carolina has long recognized the duty to warn as a traditional state law principle. Under South Carolina law, Nevro had a

duty to provide an adequate warning to end users of its product of known potential harm

that may result from use of its product when those dangers are not obvious or otherwise

known to the end user. If the warning is given to an intermediary, here Plaintiff's

implanting physician, the manufacturer will have satisfied this duty. Where the

manufacturer does not provide warnings to the intermediary, as is the case here, the state-

law duty is not satisfied.

### B. Nevro's Reporting Duties

100.    Under South Carolina law, Nevro had a duty to abide by federal reporting

requirements, including the timely and accurate reporting of adverse events.

101.    As set forth above, adverse event reports published in the FDA's MAUDE

database represents public communication by a manufacturer about a device's

performance and its relationship to a particular adverse health event.

102.    These adverse event reports, when prepared properly, serve as an early warning

signal for the FDA in monitoring device performance, detecting potential device-related

safety issues, and otherwise contributing to benefit-risk assessments of these products.

103.    Moreover, such reports are relied upon by the medical and scientific community

as a valuable source of information in learning about the genesis of a health event and the

nature of any adverse health trends with a medical device.

104.    To the extent the medical device reports contain false, inaccurate, or incomplete

information, the FDA is deprived of vital information needed to detect potential device-

related safety issues and disseminate public alerts about particular device problems

and/or its association to a particular disease.

105.     Likewise, the medical and scientific community is deprived of the information needed to educate their patients and obtain informed consent about the risks in choosing a particular device.

106.     Further, device user facilities are unable to make informed decisions about the risks of offering for purchase a particular medical device over others on the market. As a result, properly informing the FDA is a necessary step in ensuring a manufacturer satisfies their state law duty to warn end users.

### C. Nevro's Testing Duties

107.     Under South Carolina law, a manufacturer has a duty to test adequately for known or foreseeable side effects which the manufacturer knows or has reason to know are inherent in the use of its product as measured by available scientific and medical data. The very purpose of conducting tests is to discover safety issues with a product in order to protect the public.

108.     Also under state law, which does not impose duties or requirements materially different from those imposed by federal law, the manufacturer must adequately test, and validate its product and its components, to assess any association between the product and any dangerous side effect that could affect the safety of its products.

### D. Nevro's Manufacturing and Design Duties

109.     Under South Carolina law, Nevro had a duty to comply with all government standards including design validation duties genuinely equivalent to those imposed under federal law. Specifically, Nevro was obligated to use reasonable care in producing any

product that, if carelessly made, is likely to injure people when used in a foreseeable manner.

110.     Likewise, a manufacturer has a duty to ensure the product is built in accordance with its intended specifications and a defect exists when an item is produced in a substandard condition.

111.     Moreover, under South Carolina law, Nevro had manufacturing processes validation duties genuinely equivalent to those imposed under federal law. This duty requires reasonable care to be exercised in assembling component parts and inspecting and testing them before the product leaves the plant. This duty encompasses a manufacturer's obligation to employ appropriate quality control techniques to prevent manufacturing defects.

112.     As a result of Nevro's failure to establish such quality systems as required by 21 C.F.R. § 820—its SCS devices were, at times, adulterated within the meaning of 21 U.S.C. § 351(h) when they were placed in the stream of commerce by Nevro. This is evidenced by Nevro's own internal report demonstrating that at least the device implanted in Plaintiff was able to exceed 18 ohms in impedance on the day that his HFX device injured him.

113.     Plaintiff further alleges that Defendant failed to take reasonable post-market corrective and preventive action in order to validate its design and properly detect recurring quality problems related to adverse events and implement changes in methods to correct such quality problems.

114.     Also under state law, which does not impose duties or requirements materially different from those imposed by federal law, the manufacturer must adequately inspect,

test, and validate its product and its components, and monitor its manufacturing and

quality control processes to ensure there are no deviations from product specifications or

regulations that could affect the safety of its products, such as Nevro's HFX implants.

**PLAINTIFF'S HFX IMPLANT HAD MANUFACTURING DEFECTS BASED ON NEVRO'S VIOLATIONS OF CGMP REQUIREMENTS**

115.     The fundamental purpose of SCS devices is to provide relief from chronic pain.

To continuously ensure that the SCS devices could adequately fulfill this purpose, they

were subjected to numerous conditions, including the requirement that every implant

manufactured by Nevro would strictly adhere to the approved design standards and

current good manufacturing practices.

116.     By evaluation, recordkeeping, study and analysis, validation and review of

processes, equipment, supplies, and utilization of standard operating procedures, Nevro

could have assured the production of the HFX implants that complied with its

specifications and met the appropriate quality standards. Nevro was under a continuing

duty to follow the manufacturing and design specifications mandated by the FDA as part

of the PMAs, and the general requirements set forth current good manufacturing practices

("CGMPs") provisions of the MDA governing the safety and effectiveness of a PMA

medical device. *See* 21 U.S.C. 351; 21 C.F.R. Part 820.

117.     Pursuant to the CGMPs regulations, Nevro was obligated to implement and

maintain quality control systems to validate processes and conduct inspections and

testing to ensure the conformity with performance standards of the HFX implants and not

produce adulterated implants, specifically those which failed to provide the level of pain

relief provided by the trial implant 21 U.S.C. 351; 21 C.F.R. § 820.

26

118.    Notwithstanding this obligation, Nevro distributed, and at times, adulterated implants that failed to perform in the same manner as the trial device in violation of manufacturing/ design specifications and CGMP regulations designed to ensure device quality and patient safety.

119.    As a result, Nevro failed to perform its duties properly, and failed to implement and maintain quality control systems with respect to performance standards for its HFX implants, even though it was aware that its HFX implants often could, and in Plaintiff's case, did fail the prescribed performance standards of 21 C.F.R. § 820 and 21 U.S.C. 351.

120.    Plaintiff's implants were adulterated within the meaning of 21 U.S.C. 351(h) when they were placed in the stream of commerce by Nevro, in that the methods used in, or the facilities or controls used for, their manufacture, packing, storage, or installation were not in conformity with the manufacturing/design specifications and CGMP design controls enumerated in 21 C.F.R. Part 820 designed to prevent exposing patients to risks of serious injury or death when the device is used as intended by the surgeon.

121.    Nevro violated these regulations, in part, by failing to establish norms and guidelines for functional validation. It was Nevro's duty to comply with the PMAs and the FDA's Quality System Regulations and Current Good Manufacturing Practices as well as its South Carolina state law duties.

122.    Had Nevro fulfilled its CGMP duties, as set forth above, it would have detected the broad nonconformance to performance standards for its devices and could have disposed of them prior to them being introduced into the stream of commerce.

123.     As a result of Nevro's post-market negligence in adhering to its CGMP requirements, the dangerous nature of the product became known only after having been implanted in Plaintiff and causing the injuries enumerated herein.

124.     Had Nevro fulfilled its CGMP duties, the non-conforming implant would never have been implanted into Plaintiff's body.

125.     Notwithstanding these duties, Nevro violated 21 U.S.C. §§ 331, 351(h), and 21 C.F.R. Part 820 and its parallel state duties by introducing adulterated devices into interstate commerce.

**A. Nevro Violated 21 C.F.R. §§ 820.30(a)-(g), 820.70(a), 820.75 By Failing to Maintain Procedures to Control the Implant's Design and Manufacturing.**

126.     The FDA mandates that medical device manufacturers must implement design control processes to assure: 1) user needs and intended uses are met, and 2) design is adequately transferred into manufacturing. Design controls are an interrelated set of practices and procedures incorporated into the design and development process, *i.e.*, a system of checks and balances. A manufacturer must develop a design control consistent with the design's risk, which will, in turn, determine the depth/level of actions required. Design controls make a systematic assessment of the design an integral part of post-approval requirements.

127.     Design control does not end with the transfer of a design to production. Design control applies to all changes to the device or manufacturing process design, including those occurring long after a device has been introduced to the market. This includes evolutionary changes such as performance enhancements, and revolutionary changes such as corrective actions resulting from failed product analysis. The changes are part of a continuous, ongoing effort to design and develop a device that meets the user and/or

patient's needs. Thus, a manufacturer must revisit the design control process frequently during the life of a product.

128.    The example shown below illustrates the influence and import of design controls on the manufacturing process:



A.

129.    The quality system requirements dictate that, no matter what a manufacturer's processes may be, design controls must be applied appropriately to ensure device quality. That is, to say, manufacturers must establish and maintain procedures *at all stages* of the production process to ensure quality by requiring the ultimate output to conform to specified design requirements. 21 C.F.R. § 820.30(a). Pursuant to 21 C.F.R. § 820.3(s), quality refers to the totality of features and characteristics that bear on the device's ability to satisfy fitness-for-use, including safety and performance.

130.    Nevro violated 21 C.F.R. §§ 820.30(a)-(g), 820.70(a), and 820.75 by failing to establish and maintain procedures for validating the design of HFX implants. In particular, after the receipt of complaints of serious injuries and deaths demonstrating the device's failure to satisfy fitness-for-use, Nevro failed to maintain proper procedures to ensure those finished devices were in conformance with the PMA quality requirements.

Nevro likewise failed to update its design quality procedures following corrective actions resulting from the analysis of products involved in serious injury events.

**B. Nevro Violated 21 C.F.R. § 820.50(a) By Failing to Ensure All Product Components Conform to Quality Requirements.**

131.    Pursuant to 21 C.F.R. § 820.50(a), manufacturers are required to establish and maintain procedures to ensure that all purchased or otherwise received products and services conform to quality requirements. Product refers to the components, manufacturing materials, in- process devices, finished devices, and returned devices. 21 C.F.R. § 820.3(r). Component includes any raw material, substance, piece, part, software, firmware, labeling, or assembly, which is intended to be included as part of the finished, packaged, and labeled device. 21 C.F.R. § 820.3(c).

132.    The intent of Section 820.50(a) is to ensure that device manufacturers select only those suppliers, contractors, and consultants who can provide quality products and services. This is because the finished medical device's quality depends on the quality of the components and raw materials. Poor quality can cause injuries from the medical device, as well as recalls. Moreover, manufacturer diligence in complying with these requirements is critical because the FDA does not inspect component suppliers. Product or service suppliers are to be reviewed at intervals consistent with the significance of the product or service provided and demonstrate conformance to specified requirements.

133.    Nevro violated 21 C.F.R. § 820.50(a) with respect to, *inter alia*, the lead extensions used in some devices which render the HFX incompatible with magnetic resonance imaging (MRI) in conformance with quality requirements. In contravention to federal requirements, the lead extensions used in Plaintiff's implant procedure could not satisfy basic fitness for use.

### C. Nevro Violated 21 C.F.R. § 820.90(a) by Failing to Identify and Address Nonconforming Product and Processes.

134.     Anytime a device, or component thereof (21 C.F.R. § 820.3(r)), fails to meet any of its specifications (21 C.F.R. § 820.3(y)) that constitutes a nonconformity (21 C.F.R. 820.3(q)). Pursuant to 21 C.F.R. § 820.90(a), manufacturers shall establish and maintain procedures to control such nonconforming product that does not meet specifications. Nonconformances can occur in both product and process, and importantly, nonconforming processes, like Nevro's manufacturing practices, can lead to nonconforming products.

135.     When a nonconforming product or process is identified, a manufacturer must evaluate the nonconforming product. The evaluation of nonconformance must include a determination of the need for an investigation into the nonconformance. Investigations are required unless one has already been performed on a similar issue.

136.     Upon identifying a nonconforming product or process, a manufacturer must segregate those devices to ensure they are not released and are ultimately disposed. Disposition of nonconforming products must be documented, including the justification for use of nonconforming products. Any such justification is to be based on objective scientific evidence.

137.     Nevro violated 21 C.F.R. § 820.90(a) by failing to establish and maintain procedures to control SCS devices that do not conform to specification. This includes failing to identify nonconformities in relation to device impedance levels and other basic performance standards and evaluating the cause of the nonconformity. Rather than disposing of nonconforming products as required by the prevailing scientific evidence, Nevro allowed them to be sold on the open market to consumers, including Plaintiff.

31

### D. Nevro Violated 21 C.F.R. § 820.100(a) by Failing to Take Necessary and Required Corrective and Preventive Action.

138.     A manufacturer's Corrective and Preventive Action ("CAPA") subsystem is intended to be the ultimate fail-safe against product and quality problems. CAPA requirements include collecting and analyzing information to identify actual and potential product and quality problems, investigating any problems discovered, taking appropriate and effective actions, and validating the effectiveness of the action taken. Whereas corrective action deals with eliminating the cause of a detected non-conformity or other undesirable situation, preventative action is designed to eliminate the cause of a potential non-conformity or other undesirable situation. Preventative action is required even when there is more than one cause for a potential nonconformity.

139.     The procedures for implementing corrective and preventive action required under 21 C.F.R. § 820.100(a) must provide for control and action to be taken on devices distributed, and those not yet distributed, that are suspected of having potential nonconformities. CAPA requirements likewise apply to process and quality system nonconformities. The need for such action can be triggered by information coming from internal sources, such as test/inspection data and process control data, and external sources such as medical device reporting, customer complaints, and issues in similar devices from competitors.

140.     Once a nonconformity is identified, a manufacturer must investigate the root cause of the nonconformities relating to product, processes, and the quality system. Nonconforming product discovered before or after distribution must be investigated to the degree commensurate with the significance and risk of the nonconformity. Similarly, the degree of corrective and preventive action taken to eliminate or minimize actual or

potential nonconformities must be appropriate to the magnitude of the problem and commensurate with the risks encountered.

141.     Rather than engage in the required CAPA processes, Nevro suppressed adverse events and inaccurately reported others as being unrelated to the device.

142.     Despite possessing knowledge of the widespread product nonconformities and patient injuries, Nevro failed to take corrective action with respect to its own manufacturing practices to mitigate the risk to patients like Plaintiff.

143.     Nevro, in violation of 21 C.F.R. § 820.100(a), failed to establish and maintain procedures for implementing corrective and preventive action in order to properly detect recurring quality problems related to the continued failures of the HFX implants, investigate causes of nonconformities in these processes and products, identify necessary action to correct and prevent recurrence of nonconforming implants, and implement changes in methods to correct such quality problems. Despite repeatedly receiving reports and information about injuries such as those suffered by Plaintiff from internal and external sources, Nevro conducted no investigations into the nonconformities and failed to take appropriate and required corrective action. Worse yet, out of pecuniary interests, Nevro failed to thereafter take preventive action to prevent reoccurrence of the nonconformity.

### E. Nevro's Violations of Current Good Manufacturing Practices Rendered the HFX Implants Adulterated Which Led to Plaintiff's Harm.

144.     Nevro's post approval misconduct violated the PMAs, the manufacturing and design specifications, CGMPs, QSRs, other federal regulations and parallel state law, resulting in the injuries which Plaintiff suffered.

145.     The harms described above directly resulted from the variations from the approved design and manufacturing specifications. Had Nevro utilized CGMPs and complied with QSRs, and undertaken the manufacturing process in an appropriate manner, it would have consistently produced a product in conformity with its approved specifications. Moreover, by evaluation, recordkeeping, study and analysis, validation and review of processes, equipment, supplies, as well as utilization of standard operating procedures, Nevro could have assured the production of the HFX implants that complied with its specifications and met the appropriate quality standards. The Nevro HFX device that was implanted into Plaintiff was *adulterated* in that they were not manufactured in conformity with the CGMP requirements identified above. *See* 21 U.S.C. §§ 351(h), 360j(f)

146.     21 C.F.R. § 808.1(d)(2)(ii) provides that, generally, § 521(a) of the FDCA *does not preempt* a state or local requirement prohibiting the manufacture of adulterated or misbranded devices.

147.     Adulterated medical devices are not subject to preemption.

148.     These specific allegations of violations of the federal PMAs, laws, regulations, and requirements due to manufacturing in violation of federal law are not subject to federal preemption.

149.     Nevro's violations of the PMAs and violations of FDA requirements set forth in the QSRs and CGMPs, specifically, failure to adhere to 21 C.F.R. § 820.80 requiring the sequestration of devices that don't meet performance standards, was a direct cause Plaintiff's injuries.

150.    But for Nevro's failure to comply with the above requirements, including established post-market validation and correction obligations, Plaintiff would have decided against implantation and his injuries would not have occurred.

151.    Similarly, Nevro violated its parallel state law duties in failing to ensure conformity to its own PMA specifications and compliance with CGMPs, resulting in adulterated devices.

### F. Nevro Violated 21 C.F.R. § 803.19(b) And 21 C.F.R. §§ 803.50, *et seq*. By Employing a Flawed Database Algorithm That Ignored Cases of Serious Injuries from SCS Devices.

152.    A manufacturer must report adverse events no later than 30 calendar days after the day that it received or otherwise become aware of information, *from any source*, that reasonably suggests that a device may have caused or contributed to a death or serious injury or malfunctioned. 21 C.F.R. § 803.50 (emphasis added).

153.    This reporting duty is triggered not just for events occurring within the United States and its territories, but also adverse events occurring in a foreign country concerning the device. *See* 21 C.F.R. § 803.52(e)(3) (incorporating by reference FDA Form 3500A, Block G). Under the FDA's Medical Device Reporting for Manufacturers Guidance for Industry, the FDA considers an event that occurs in a foreign country reportable under the MDR regulations if it involves a device that has been cleared or approved in the United States—or a device similar to a device marketed by the manufacturer that has been cleared or approved in the United States—and is also lawfully marketed in a foreign country.

154.    Nevro's reporting requirements under federal law are stringent and any deviations therefrom requires express authorization by the FDA. 21 C.F.R. § 803.19(b). Absent an

35

affirmative exemption, Nevro was required to collect all the information required by 21 C.F.R. § 803.52 that is known or reasonably known. By deliberately excluding pertinent event information, Nevro failed to comply with 21 C.F.R. § 803.19(b) through its use of its algorithm in this manner and as a result excluded reportable events from reporting despite never being granted an exemption to do so by the FDA. Nevro was well-versed in the information to be collected and disclosed and had been fulfilling that obligation for decades for a variety of adverse events. And yet, when presented with numerous severe and life-threatening complications from its devices, it deliberately implemented a system that turned a blind eye to it.

155.     As a result, Nevro was engaged in inadequate post-market surveillance concerning:

   i.    The analysis of the incident outcomes broken down by SCS devices by device specification, in order to allow the inter-comparison of the Benefit/Risk ratio of the various SCS models;
   ii.   The exhaustive list of the typologies of reported incidents, from the most frequent to the rarest ones; and
   iii.  The in-depth analysis of the key points, issues and stakes stemming from the data related to adverse event cases, including the demonstration of the preservation of the SCS devices' Benefit/Risk ratio.

156.     Under federal law, a medical device report must contain all the information required by 21 C.F.R. § 803.52 that is known or reasonably known to the manufacturer. Information considered reasonably known includes any information: 1) that can be obtained by contacting a user facility, importer, or other initial reporter; 2) that is in the manufacturer's possession; or 3) that can be obtained by analysis, testing, or other evaluation of the device. 21 C.F.R. § 803.50(b).

157.     Likewise, the information to be disclosed is equally expansive. The reporting requirements are expansive, and a manufacturer "must include," amongst other items:

36

    i.  An identification of the adverse event or product problem;

    ii.  A description of the event or problem, including a discussion of how the device was involved, nature of the problem, patient follow-up or required treatment, and any environmental conditions that may have influenced the event;

    iii.  A summary of the evaluation of the device, or an explanation of why an evaluation was not performed;

    iv.  Evaluation codes;

    v.  Whether remedial action was taken and the type of action; and

    vi.  An explanation of why any required information was not provided in the MDR and the steps taken to obtain this information.

21  C.F.R. § 803.52.

158.    Rather than complying with these obligations, Nevro deliberately limited its reports to cursory reviews of the manufacturing and sterilization records of the device lot which is the subject of a particular adverse event, *without further investigation.* This conduct falls well-short of the requirements of 21 C.F.R. §§ 803.50, *et seq*. Despite the public health crisis implicated by the product complaints it was receiving, Nevro deliberately and unlawfully limited the information it was collecting about injuries from its devices, concealed how and when it was collecting it, and performed virtually no assessment of production impact on these events for years.

### G. Nevro Violated 21 C.F.R. §§ 803.1, 803.19(b), And 803.50 and Parallel State Law By Concealing Pertinent Adverse Event Reports.

159.    As complaints continued to rise in frequency, rather than complying with the federal statute and regulations on medical device reporting, Nevro devised a scheme to use vague, boilerplate MDR analyses in connection with events associated with its products.

160.    Nevro is required by law to truthfully report the circumstances of an adverse event, including whether and how a medical device is involved in an adverse event, pursuant to 21 C.F.R. § 803.32(b)(5).

161.     In spite of this requirement Nevro consistently reports the vast majority of adverse events using the problem code 2993, which corresponds to "Adverse Event Without Identified Device or Use Problem." Out of 3,171 adverse event reports which Nevro reported to the FDA from the date the Senza system was first sold in the United States to the day Plaintiff was implanted with a permanent Senza system, Problem Code 2993 solely accounted for, or was included in, 93.74% of all adverse event reports. The complaints were then closed without further investigation.

162.     In addition to the adverse events which are the subjects of reports reflected in the MAUDE database, there were at all times relevant to this action – and continue to be – adverse events involving the Senza system which Nevro failed to report to the FDA in violation of 21 C.F.R. §803.1, *et seq*. and in parallel violation of South Carolina law.[7]

163.      Additionally, Nevro consistently violates the reporting requirements by failing to report adverse events known to them by operation of published medical literature.

164.     Had Nevro lawfully reported all of the reportable adverse events known to them from the time of initial commercialization until the time of Plaintiff's implantation or symptoms, he would not have suffered the injuries enumerated herein.

165.     Upon information and belief, the numerosity of unreported serious adverse events involving the Senza system is such that – had Nevro lawfully reported all known adverse events required by law – FDA intervention and/or informed decision-making by Plaintiff's physician would have prevented the implantation of the Senza system in Plaintiff. Instead, the Plaintiff and his physician were both unaware of the extent of the

---

[7]Despite being on notice of the injuries suffered by Plaintiff as a result of the failure of the Senza II device, it was Plaintiff – not Nevro – who apprised the FDA of the adverse event that is the subject of this lawsuit.

risk of the injuries enumerated herein when the subject device was implanted, causing him serious injuries.

### H. Nevro's Reporting Abuses and Plaintiff's Harm Are Causally Related.

166. The medical and scientific community relies on the FDA's MDR information, in particular the MAUDE database, for studying and evaluating new and emerging treatments and complications.

167. Also under South Carolina law, which imposes duties genuinely equivalent to those imposed by federal law, the manufacturer must act reasonably in conveying warnings concerning the safety of its products. Nevro was, thus, under a continuing duty under state law to adequately report injuries and problems with its devices, including the products, to the FDA.

168. As a result of Nevro's post-market failure to report to the FDA and as a result of Nevro's post-market misconduct, the defective and unreasonably dangerous nature of the product became known only after having been implanted in Plaintiff, and otherwise would have never been implanted in Plaintiff at all.

169. Had Nevro properly reported the adverse events associated with its HFX implants, the FDA would have included accurate accounts of those adverse event reports in the MAUDE database. Plaintiff's implanting physician, who visits the MAUDE database and reads adverse event reports prior to making product recommendations, would have seen the adverse event reports related to the HFX and would have recommended safer treatment modalities for Plaintiff.

## PUNITIVE DAMAGES ALLEGATIONS

170.    Plaintiff specifically alleges that Defendant acted willfully and wantonly with malice, i.e., evil intent, intent to injure, intent to retaliate and/or intent to oppress.

171.    Nevro's manufacture, marketing, promotion, distribution and sale of a defective product and their failure to provide adequate warnings and instructions concerning the hazards it knew to exist was oppressive and done with conscious and reckless disregard for the rights and safety of others, including Plaintiff.

172.    Nevro knowingly withheld and affirmatively misrepresented information, required to be communicated by federal and state law, to Plaintiff, the medical community, and the public at large.

173.    Nevro downplayed, understated and/or disregarded their knowledge of the serious and permanent side effects and risks associated with the use of the HFX implants despite available information demonstrating that the HFX implants were likely to cause serious and potentially fatal side effects to users.

174.    At all times relevant hereto, Nevro knew of the defective nature of the HFX implants, and continued to design, manufacture, market, label, and sell the HFX implants to maximize sales and profits at the expense of public health and safety.

175.    Nevro misled regulators, the medical community and the public at large, including Plaintiff, by making false and misleading representations, and knowingly withholding information, about the safety of the HFX implants.

176.    As a direct and proximate result of Nevro's intentional, willful, wanton and reckless disregard for the safety of the public generally and of Plaintiff in particular, Plaintiff suffered profound injuries which are permanent and continuing in nature,

required and will require medical treatment and hospitalization, have become and will

become liable for medical and hospital expenses, lost and will lose financial gains, have

been and will be kept from ordinary activities and duties and have and will continue to

experience mental and physical pain and suffering, disability and loss of enjoyment of

life, all of which damages will continue in the future.

177.    Plaintiff specifically requests punitive damages against Defendant to the

maximum extent permitted by applicable state law on each count for which such damages

may be authorized.

**CAUSES OF ACTION**
**COUNT I – PRODUCT LIABILITY -MANUFACTURING DEFECT**

178.     Plaintiff re-alleges and incorporates by reference the allegations contained in the

preceding paragraphs of this Complaint.

179.    Nevro's HFX implants were in a defective condition at the time of sale, beyond

which would be contemplated and expected by the ordinary consumer.

180.    HFX implants were expected to, and did reach, Plaintiff without substantial

change to their condition which was defective unsafe and unable to be used without

subjecting Plaintiff to a significant risk of injury.

181.    No ordinary consumer nor any licensed physician would have contemplated that

the Nevro HFX implants would cause these injuries because the exterior of the device

was innocuous and presented no indication that the electronics inside were in a condition

that made the device unsafe.

182.    Neither Plaintiff nor his medical providers could, in the exercise of reasonable

care, have discovered the manufacturing defect because neither were familiar or

reasonably able to become familiar with the mechanical processes involved in producing or testing the HFX.

183.      The Nevro HFX implant Plaintiff received was not the SCS device approved by the FDA as it deviated from specifications as shown be Nevro's own device interrogation for Plaintiff's HFX on the day of his injury.

184.      Nevro manufactured Plaintiff's defective HFX implants, in deviation of its specifications, which caused Plaintiff's injury.

185.      Such manufacturing is in violation of state law, which does not impose duties or requirements materially different from those imposed by federal law including the PMA post- approval specifications and regulatory requirements, resulting in product failure and serious injury to Plaintiff.

186.      Nevro had parallel duties under state and federal law pursuant to the federal post-approval requirements, to exercise reasonable care in manufacturing the products without deviations and defects.

187.      Nevro's South Carolina-based duties do *not* add to or change Nevro's manufacturing requirements. Nor does it require that Nevro HFX implants be manufactured in a manner different from the FDA approved manner.

188.      This claim parallels the FDA requirements that Nevro manufacture its SCS devices to avoid plaintiff defect-related injury, in accordance with the FDA regulations and PMA specifications.

189.      **WHEREFORE**, Plaintiff demands judgment against Nevro for all such compensatory, statutory and punitive damages available under applicable law, together

with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper and appropriate.

## COUNT II– BREACH OF IMPLIED WARRANTIES

190.      Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

191.      As set forth in the manufacturing defect section above, Nevro sold its HFX implants to Plaintiff in a defective condition which violated the FDA's requirements.

192.      Nevro knew that Plaintiff and his physician were purchasing the HFX implants for chronic pain management, and both were relying on Nevro for furnish suitable goods that adhered to its FDA specifications.

193.      Nevro's violations of its federal requirements caused Plaintiff's HFX implants to be defective such that they did not conform to Nevro's implied warranty that they were fit for their ordinary and intended purpose.

194.      Plaintiff's claim for breach of warranty is based on Nevro's noncompliance with its FDA specifications and does not add to or change anything required by the FDA.

195.      This breach of implied warranty claim, or the selling of non-conforming HFX implants as though they have met all federal requirements, caused Plaintiff's injuries.

196.      Plaintiff seeks to hold Nevro and Globus accountable *only* for what federal law mandated - nothing more. Nothing in this claim is different from, or in addition to, the federal requirements.

197.      Nevro impliedly warranted that the product was fit for its particular purpose for which it was intended and of merchantable quality.

198.     Nevro breached the implied warranty of merchantability by selling products that were not of merchantable quality and were not safe and fit for their intended use.

199.     Plaintiff and Plaintiff's physician relied upon Nevro's implied warranties that the Nevro HFX implants were manufactured in accordance with federal specifications.

200.     Plaintiff's injuries are permanent and continuing in nature, required and will require medical treatment and hospitalization, have become and will become liable for medical and hospital expenses, lost and will lose financial gains, have been and will be kept from ordinary activities and duties and have and will continue to experience mental and physical pain and suffering, disability and loss of enjoyment of life, all of which damages will continue in the future.

201.     **WHEREFORE**, Plaintiff demands judgment against Nevro and Globus for all such compensatory, statutory and punitive damages available under applicable law, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT III- NEGLIGENCE

202.     Plaintiff incorporates by reference all previous and subsequent paragraphs of this Complaint as if fully set forth here and further alleges as follows:

203.     At all relevant times, Nevro had a duty to Plaintiff to, *inter alia*,:

    A.  manufacture the HFX implants properly in compliance with applicable regulations and FDA specification;

    B.  Disseminate accurate and truthful information about risks and benefits of the HFX device;

C. Accurately and truthfully report known adverse events, injuries, and malfunctions relating to the HFX device;

D. Conduct good-faith investigations into known adverse events, injuries, and malfunctions relating to the HFX device;

E. Assure that company representatives charged with setting and modifying the delivery of electricity into a patient's spinal cord are appropriately trained and credentialed to provide this type of medical care;

F. Develop and maintain data-driven processes to assure that the device settings chosen for a patient are reasonably calculated to (1) deliver the pain relief warranted by company representatives and (2) avoid injury to the patient;

204. As set forth throughout this Complaint, Nevro breached its parallel state and federal duties to Plaintiff and Plaintiff's physician, in the following ways, among others:

A. Failing to establish procedures for conducting quality audits and to conduct such audits to assure that the quality system was in compliance with the established quality system requirements and to determine the effectiveness of the quality system as required by 21 C.F.R. § 820.22;

B. Failing to perform proper risk analysis as required by 21 C.F.R. § 820.30(g);

C. Failing to establish and maintain procedures for monitoring and control process parameters for validated processes to ensure that the specified requirements continue to be met as required by 21 C.F.R. §820.75(b);

D. Failing to develop, conduct, control, and monitor production processes to ensure that devices conformed to specifications as required by 21 C.F.R. § 820.70(a);

E.  Failing to investigate the cause of nonconformities relating to product, processes, and the quality system as required by 21 C.F.R. §820.100(a)(2); and

F.  Failing to identify the actions needed to correct and prevent recurrence of nonconforming product and other quality problems as required by 21 C.F.R. 820.100(a)(3);

G.  Failing to disseminate accurate and truthful information about risks and benefits of the HFX device;

H.  Failing to accurately and truthfully report known adverse events, injuries, and malfunctions relating to the HFX device;

I.  Failing to conduct good-faith investigations into known adverse events, injuries, and malfunctions relating to the HFX device;

J.  Failing to assure that company representatives charged with setting and modifying the delivery of electricity into a patient's spinal cord are appropriately trained and credentialed to provide this type of medical care;

K.  Failing to develop and maintain data-driven processes to assure that the device settings chosen for a patient are reasonably calculated to (1) deliver the pain relief warranted by company representatives and (2) avoid injury to the patient;

205.    Each of the above acts of negligence, whether acts of omission or commission, were a proximate cause of Plaintiff's injuries because manufacturing a medical device in such a fashion led to Nevro turning a blind eye to deviations in manufacturing specifications and those deviations made injuries outcomes like the one Plaintiff experienced highly foreseeable.

206.    Nothing within this claim adds to or changes any federal requirements.

207.     At all material times, Nevro owed to Plaintiff a duty to use reasonable care, pursuant to the federal post-approval requirements, in the manufacture of its SCS devices and breached this duty by manufacturing and selling Plaintiff defective implants.

208.     Nevro breached these duties as set forth above.

209.     Nevro's South Carolina-based duties do *not* add to or change Nevro's manufacturing requirements. Nor does it require that Nevro HFX implants be manufactured in a manner different from the FDA approved manner.

210.     This claim parallels the FDA requirements in that it requires Nevro to manufacture Nevro HFX implants in accordance with the FDA regulations and PMA specifications.

211.     **WHEREFORE**, Plaintiff demands judgment against Defendant for all such compensatory, statutory and punitive damages available under applicable law, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT IV – FRAUDULENT MISREPRESENTATION

212.     Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

213.     In the conduct of their marketing efforts, as set forth in detail herein, Defendant (and/or its employees, including but not limited to Chelsea, Charity, and Beth) made multiple misrepresentations of fact, expressly and/or impliedly.

214.     In South Carolina, the elements for Fraudulent Misrepresentation includes:

A.  The defendant made a false representation to the plaintiff;

B.  The defendant had a pecuniary interest in making the statement;

C.  The defendant owed a duty of care to see that he communicated truthful information to the plaintiff;

D.  The defendant breached that duty by failing to exercise due care;

E.  The plaintiff justifiably relied on the representation; and

F.  The plaintiff suffered a pecuniary loss as the proximate result of his reliance on the representation.

215.    Defendant, itself and through its sales representatives (and/or other employees), knew that the factual assertions were false or deliberately avoided finding out the truth of their claims.

216.     Upon information and belief, at the time of said misrepresentations, Nevro's employees were acting within the scope of their employment with Defendant; said misrepresentations happened in furtherance of the business of Nevro; and was done incident to the performance of the duties entrusted to Nevro's employees by Defendant Nevro, who is therefore vicariously liable for said fraud under the doctrine of *Respondeat Superior*.

217.    Upon information and belief, Defendant employees' conduct was of a kind they were employed to perform, occurred during a period not unreasonably disconnected from their authorized period of employment with Defendant Nevro, in a locality not unreasonably distant from their authorized area, and actuated at least in part by a purpose of Defendant solely for its wrongful financial benefit.

218.    Upon information and belief, Defendant ratified and/or adopted its employee's actions with knowledge of these material facts through both express acceptance and/or to

be inferred from silence or failure to object and/or take any action whatsoever when advised of the facts.

219.     Upon information and belief, Defendant acted with actual and implied malice as their actions are characterized by evil motive, intent to injure, ill will, and/or fraud.

220.     Defendant committed fraud with "actual knowledge of falsity, coupled with [an] intent to deceive."

221.     Defendant, acting with scienter and/or malice, engaged in such misrepresentations with the intent to deceive and defraud Plaintiff and induce his reliance, i.e. his implant of Nevro's product, on Defendant's false assertions, including but not limited to those set forth herein.

222.     Plaintiff, a customer of Nevro in need of pain relief, relied on Defendant's fraudulent misrepresentations in permitting the SCS device to be implanted in him, and such reliance was of material detrimental to him, in that he suffered severe and permanent injury.

223.     All of the representations that form the basis of his cause of action arose reached farther in their claims of safety and efficacy or denial of adverse outcomes than was approved by the FDA for use in any of the device literature.

224.     Plaintiff suffered substantial damages as a result of such reliance and resulting implantation, as set forth and detailed herein.

225.     **WHEREFORE**, Plaintiff demands judgment against Defendant for all such compensatory, statutory and punitive damages available under applicable law, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT V – BREACH OF EXPRESS WARRANTIES

226.     Plaintiff incorporates the preceding paragraphs as if set out fully herein.

227.     Defendants through their officers, directors, agents, representatives, and written literature and packaging, and written and media advertisement, expressly warranted that the HFX was safe and fit for use by consumers, was of merchantable quality, did not produce dangerous side effects, and was adequately tested and fit for its intended use.

228.     Defendants further warranted, as set forth herein:

A. That the pain relief results from a permanent IPG implant would be equal to or better than those achieved in the Trial Stimulation period;

B. That the permanent HFX would permanently deliver substantial pain relief;

C. That Plaintiff would be able to resume normal activities of daily living following implantation of the permanent HFX IPG;

D. That she and Nevro's other representatives would be readily available to Plaintiff for the purpose of adjusting device settings to optimize pain relief;

E. That Nevro's sales reps have the medical knowledge and training necessary to make purposeful, effective adjustments to the HFX device settings to achieve adequate pain relief.

229.     The HFX did not conform to the Defendants' express representations because it is not reasonably safe, has numerous serious side effects, and causes severe and permanent injury, and did not deliver the claimed results.

230.     At all relevant times, the HFX did not perform as safely as an ordinary consumer would expect, when used as intended or in a reasonably foreseeable manner.

231.     Plaintiff, his physicians, and the medical community reasonably relied upon the Defendants' express warranties for the HFX.

50

232.    Privity exists between Plaintiff because Nevro made the instant warranties directly to Plaintiff and to Plaintiff's physicians and because Plaintiff's physicians acted as Plaintiff's purchasing agents in the subject transaction and/or because Plaintiff was a third-party beneficiary of the subject contract.

233.    At all relevant times, the HFX was used on Plaintiff by Plaintiff's physicians, Nevro's agents, and Plaintiff for the purpose and in the manner intended by Defendants.

234.    Plaintiff and Plaintiff's physicians, by the use of reasonable care, could not have discovered the breached warranty and realized its danger.

235.    All of the warranties that form the basis of his cause of action arose reached farther in their claims of safety and efficacy or denial of adverse outcomes than was approved by the FDA for use in any of the device literature.

236.    As a direct and proximate result of the breach of Defendant's express warranties, Plaintiff has suffered, and will continue to suffer, severe physical pain and injuries which are permanent and lasting in nature, emotional distress, loss of the capacity for the enjoyment of life, medical and nursing expenses, surgical expenses, and economic loss as alleged herein. These damages have occurred in the past and will continue into the future.

237.    Upon information and belief, Plaintiff's healthcare providers sent notice to Defendants of the adverse event that occurred to Plaintiff and thus, the nonconformity of the HFX, within a reasonable period of time following discovery of the breach of warranty and before suit was filed.

238.    **WHEREFORE**, Plaintiff demands judgment against Nevro and Globus for all such compensatory, statutory and punitive damages available under applicable law,

together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT VI - NEGLIGENCE (Statute or Ordinance Rule)
a.  <u>Violation of South Carolina Code. Ann. § 40-47-30 (2025)</u>

239.     Plaintiff incorporates the preceding paragraphs as if set out fully herein.

240.     South Carolina's Code. Ann. § 40-47-30 (2025) was created to reduce the risk of physical injury resulting from the practice of medicine by unqualified individuals. As a state law, the code section is intended to protect all South Carolina citizens from this danger.

241.     Plaintiff is a South Carolina citizen and is thus amongst the class of individuals intended to be protected by the statute.

242.     As set forth herein, Nevro employed sales representatives to adjust program settings on the Spinal Cord Stimulator implanted in Plaintiff.

243.     These sales representatives were agents of Defendant by way of their employment agreements with Defendant and the fact that they were instructed to perform these adjustments as a part of the services rendered by Defendant through the course of Defendant's business. The aforementioned misconduct occurred while these Nevro agents attempted to perform their job duties of programming and adjusting the settings of Plaintiff's HFX. As a result, the misconduct alleged herein occurred within the course and scope of their employment by Nevro, and Nevro is vicariously liable for the damages Plaintiff incurred.

244.     These sales representatives were not licensed by the South Carolina Medical Board. These sales representatives were not acting under the guidance, counseling, instruction or training of licensed healthcare professionals.

245.     Defendant violated § 40-47-30 when it allowed its sales representatives to control, monitor, administer and otherwise be in control of the HFX device implanted in Plaintiff when such individuals were not licensed by the South Carolina Medical Board to practice medicine because their role in the usage of the Senza then became one of providing treatment to Plaintiff. Defendant's agents likewise violated § 40-47-30 when they agreed to engage in the practice of medicine without a license themselves.

    b.     Violations of Safety Regulations and Current Good Manufacturing Practices

246.     Much like the above cited sections of South Carolina's Licensure Requirement, the federal regulations cited above are all in place to protect the health and wellbeing of American citizens like Plaintiff. Specifically, those provisions are in place to ensure that consumers of medical devices like the subject Senza are protected from injuries that result from either unlawful manufacturing practices or risks associated with the device that were not properly disclosed to the FDA.

247.     For reference, those relevant federal regulations include 21 C.F.R §§ 820- 30(a)-(g), 820.70(a), 820.75, 820.50(a), 820.90(a), and 820.100(a) regarding manufacturing oversight and 21 C.F.R. §§ 803.19(b), 802.50, *et seq,* and 803.1. regarding adverse event report requirements.

248.     Defendants violated the above regulations related to manufacturing by allowing a Senza onto the market despite its ability to exceed 18 ohms in impedance. Defendants likewise violated the above referenced regulations regarding adverse events of injurious overstimulation, i.e. shocking, by classifying such incidents on the Maude database as unrelated to device performance.

249.     Plaintiff suffered a physical injury to the exact part of his body that Defendant's sales representatives endeavored to treat. The injury incurred is the exact type of injury that § 40-47-30 is intended to protect against. A licensed physician would have taken a more conservative approach to adjusting the settings of Plaintiff's HFX such as in person adjustment and/or a thorough investigation of the device placement. To the extent that such an approach could have avoided the mal performance made inherently possible in Plaintiff's HFX by Defendant's defective manufacturing, placing Plaintiff's medical care in the hands of unlicensed sales representatives prevented him from avoiding such an outcome to the extent possible. Defendant's employ of unlicensed sales representatives to practice medicine therefore forms a substantial factor, along with Defendant's own negligent manufacturing of Plaintiff's HFX, in causing his injuries.

250.     As a direct and proximate result of Defendant's violation of § 40-47-30 and the federal regulations cited herein, Plaintiff has suffered, and will continue to suffer, severe physical pain and injuries which are permanent and lasting in nature, emotional distress, loss of the capacity for the enjoyment of life, medical and nursing expenses, surgical expenses, and economic loss as alleged herein. These damages have occurred in the past and will continue into the future.

251.     **WHEREFORE**, Plaintiff demands judgment against Defendants for all such compensatory, statutory and punitive damages available under applicable law, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

### COUNT VII - VIOLATION OF SOUTH CAROLINA'S UNFAIR TRADE PRACTICES ACT (S.C. CODE ANN. § 39-5-10, ET SEQ.)

252.     Plaintiff incorporates the preceding paragraphs as if set out fully herein.

54

253.     Plaintiff purchased the Nevro Senza for his own personal use at the age of 57.

254.     In deciding to purchase the Nevro Senza, Plaintiff listened and believed the representations made by Nevro's sales reps because those individuals, as employees of the manufacturing company, appeared to have sufficient knowledge about the device.

255.     Those representations included claims that the device was safe to use, was incapable of exceeding the FDA imposed limitation on maximum impedance, was unable to deliver dangerous amounts of electrical stimulation to Plaintiff, and the device would relieve rather than worsen Plaintiff's underlying back condition.

256.     These representations were demonstrably false given the device performance of the subject Senza device that was implanted in Plaintiff.

257.     These representations had the tendency of misleading Plaintiff because he took these representations as reliable proof that the Senza he would receive was safe to use and would not injure him.

258.     These representations suggested to Plaintiff that the Senza device he would receive was safer than it turned out to be and thus amount to representations that the Senza he received had qualities that it did not possess.

259.     Nevro's representatives also failed to disclose that Nevro's quality assurance mechanisms were inadequate and not in compliance with federal law. Had Plaintiff known about these inadequate manufacturing oversight practices, he would have discounted the representations about the Senza's safety profile. As a result, the omission of this information amounts to a failure to state a material fact that tended to deceive Plaintiff.

260.        Nevro's representatives made these false representations and concealments with the intent to induce Plaintiff's purchase of the subject Senza because they were employed for the express purpose of promoting the sale of Nevro's devices, including the subject Senza.

261.        As a result of Plaintiff's reliance on these representations, Plaintiff incurred an actual injury or loss in the form of physical injury to his lower body and nervous system as well as economic damages in the form of medical bills for treatment of said injury.

262.        **WHEREFORE**, Plaintiff demands judgment against Defendants for all such compensatory, statutory and punitive damages available under applicable law, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT VIII - NEGLIGENT MISREPRESENTATION

263.        Plaintiff incorporates the preceding paragraphs as if set out fully herein.

264.        By employing sales representatives to deliver hands on treatment of Plaintiff via its Senza device, Nevro owed Plaintiff a duty of care because delivery of such services comes with the foreseeable risk that individuals like Plaintiff may suffer physical injuries if such treatment is not performed properly.

265.        Nevro's representatives made false statements about the Senza. Those statements include claims that the device was manufactured pursuant to federal regulation, that it was limited in its performance to not exceed 18 ohms in impedance, that it would not deliver harmfully excessive stimulation, that it would improve rather than worsen Plaintiff's underlying back condition, and that Nevro's representatives were able to handle the device in such a way that would not injure Plaintiff.

56

266.     Nevro's representatives made these statements with the intent that Plaintiff would act on them by purchasing the subject Senza device because these representatives were employed by Nevro to sell Senza devices.

267.     By way of their status as Nevro employees, Nevro's representatives knew that Plaintiff would perceive them as adequately informed about the Senza such that they knew he would rely on the representations they made about its safety. Had Plaintiff known of the significant risk of overstimulation the subject Senza was capable of—either intrinsically or by improper handling by Nevro's representatives—he would not have had the device implanted. As such the aforementioned statements were made by Nevro's representatives with the knowledge that Plaintiff would rely on them and that if they were untrue, that he would be injured as a result of so relying.

268.     Plaintiff's reliance on these statements was justified as Nevro had failed to properly report similar adverse events to those he eventually experienced and Nevro's representatives held themselves out as having sufficient knowledge of the subject Senza by way of their employment status as Nevro representatives.

269.     As a direct and proximate result of Defendant's negligent misrepresentations, Plaintiff has suffered, and will continue to suffer, severe physical pain and injuries which are permanent and lasting in nature, emotional distress, loss of the capacity for the enjoyment of life, medical and nursing expenses, surgical expenses, and economic loss as alleged herein. These damages have occurred in the past and will continue into the future.

**WHEREFORE**, Plaintiff demands judgment against Defendants for all such compensatory, statutory and punitive damages available under applicable law, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that the Court enter judgment in his favor and against Nevro, awarding Plaintiff:

I.   actual or compensatory damages including pain and suffering, emotional distress, disfigurement, past and future medical expenses, and lost wages in such amount to be determined at trial and as provided by applicable law;

II.  exemplary and punitive damages sufficient to punish and deter Nevro and others from future malicious, negligent, and reckless practices;

III. pre-judgment and post-judgment interest;

IV.  costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

V.   any other relief the Court may deem just and proper.


## JURY DEMAND

Plaintiff respectfully demands a trial by jury on all of the triable issues within this pleading.

Dated: March 2, 2026                    Respectfully submitted,

**ROGERS, PATRICK, WESTBROOK & BRICKMAN, LLC**

*/s/ Elizabeth Middleton Burke*
By:   Elizabeth Middleton Burke (Fed. ID 7466)
      Misty Black O'Neal (Fed. ID 12262)
      1037 Chuck Dawley Boulevard, Bldg. A,
      Mount Pleasant, South Carolina 29464
      Phone: 843.727.6500
      Fax: 843.216.6509
      bburke@rpwb.com
      moneal@rpwb.com


**THE CARLSON LAW FIRM, PC**

      Adam M. Evans (MO# 60895)
      Elijah Biedinger (TX# 24145383)
      100 E. Central Texas Expy.
      Killeen, TX 76541
      Main: 254-526-5688
      Fax: 254-526-8204
      aevans@carlsonattorneys.com
      ebiedinger@carlsonattorneys.com

*(Application for admission pro hac vice forthcoming)*

*ATTORNEYS FOR PLAINTIFF DOUGLAS LHAMON*